

Billy Redding
Patient No.
Coalinga State Hospital
P.O. Box 5003
Coalinga, CA 93210-5003
Tel: (559) 935-8771

*Plaintiff in Pro Se*

RECEIVED

SEP 28 2022

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
Y_____DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

BILLY REDDING,
    *Plaintiff,*

    vs.

STEPHANIE CLANDENIN, Director of
California Department of State Hospitals, in
her official capacity only; and BRANDON
PRICE, Executive Director of Coalinga State
Hospital, in his official capacity only,
    *Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 1:22-CV-01234-EPG (PC)

**CIVIL RIGHTS COMPLAINT**
***(Pursuant to 42 U.S.C. § 1983)***
    **FOR VIOLATIONS OF THE**
    **FOURTEENTH AMENDMENT TO**
    **THE UNITED STATES**
    **CONSTITUTION**

## <u>COMPLAINT</u>

PLAINTIFF, BILLY REDDING ("Plaintiff") hereby alleges upon information and

belief:

1. Plaintiff files this Complaint to enjoin the named Defendants from egregiously and

flagrantly depriving Plaintiff, housed in California Department of State Hospitals' (herein

"DSH") Coalinga State Hospital (herein "CSH") of rights, privileges, or immunities secured

and protected by the Constitution.

## <u>I. JURISDICTION AND VENUE</u>

2. This is a civil cause of action based upon jurisdictional elements giving this court

authority to adjudicate the matters, and grant the requested relief, herein. This court has

subject matter jurisdiction over this matter pursuant to 42 U.S.C. §1983.

### 42 U.S.C. §1983

3. Plaintiff invokes federal jurisdiction against State officers/actors/employees pursuant to 42 U.S.C. §1983. Section 1983 permits a plaintiff to bring suit against a state defendant if that state agent deprived him of a constitutional right, acting under color of state law. (See *Adickes v. S.H. Kress & Coe* (1970) 398 U.S. 144) Said Defendants "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." (*West v. Atkins* (1988) 47 U.S. 42, 49)

## Venue

4. The acts alleged herein occurred at CSH which is located within the California County of Fresno which is within the jurisdiction of the United States District Court, Eastern District of California. Consequently, this court is an appropriate venue under 28 U.S.C. §1391(b)(2).

## II. PLAINTIFF

5. Plaintiff is a resident of the State of California. Plaintiff is currently being "civilly detained" at DSH's CSH pursuant to the "Sexually Violent Predator Act"[1] (herein "SVPA").

6. Plaintiff is filing this Complaint *in pro se.*

## III. DEFENDANTS

7. At all times material hereto, Defendant STEPHANIE CLANDENIN, was the Director of the DSH which is the entity to which the other Defendant listed herein is organized under, and whose acts and/or omissions give rise to this Complaint. Defendant Clandenin is responsible for overseeing the operations of all DSH facilities including CSH. Defendant Clandenin is responsible for the policies that govern the manner within which DSH operates, including but not limited to ensuring the the administration of the SVPA within DSH facilities does not violate the Fourteenth Amendment to the United States

---

[1] California's Welfare and Institutions Code §§ 6600, *et seq.*

Constitution. Consequently, Defendant Clandenin was directly involved in the acts and/or omissions that give rise this Complaint. Defendant Clandenin is sued in her official capacity only.

8. At all times material hereto, Defendant BRANDON PRICE, Executive Director of the DSH's CSH, and is subsequently the most senior administrator of CSH. As Executive Director of CSH Defendant Price is responsible for ensuring the care and well-being of all of those detained within CSH, including ensuring the the administration of the SVPA within DSH facilities does not violate the Fourteenth Amendment to the United States Constitution. Consequently, Defendant Price was directly involved in the acts and/or omissions that give rise this Complaint. Defendant Price is sued in his official capacity only.

## VI. EXHAUSTION OF ADMINISTRATIVE REMEDIES

9. Plaintiff is a pre-trial civil detainee and is consequently not required to exhaust administrative remedies. (*Page v. Torrey* (9th Cir. 2000) 201 F.3d 1136, 1138)

## VII. FACTUAL ALLEGATIONS ENTITLING PLAINTIFF TO RELIEF

10. Defendants are legally responsible, in whole or in part, for the operation of the DSH's CSH and for the health and safety of the persons residing in the Facilities.

11. DSH's CSH provides care to psychiatric patients committed civilly, or civilly detained, pursuant to the SVPA.

12. Defendants are obligated to operate DSH's CSH in a manner that does not infringe upon the federal rights, as protected by the Fourteenth Amendment to the Constitution of the United State, of individuals confined to DSH's CSH.

13. At all relevant times, Defendants have acted or failed to act, as alleged herein, under color of state law.

14. Plaintiff is DSH detainee since, or about, May 14, 2002 as the California Superior Court (County of Ventura), in a matter assigned case number 2013024657,

ordered Plaintiff civlly detained, and later civilly committed, pursuant to California's SVPA. Subsequently, Plaintiff was ordered to remain civilly detained by the DSH for the two purposes of (1) the protection of the public, and (2) Plaintiff being afforded treatment the state deemed was required to ensure he was no longer a danger to the public[2].

15. On, or about, June 18, 2006 Plaintiff began the DSH's treatment program, for those detained pursuant to the SVPA, entitled the "Sex Offender Treatment Program" (herein "SOTP"). (See Exhibit A – DSH's official Description of the SOTP)

16. There are four stages, referred to as "modules", of the current DSH SOTP. The final stage is SOTP Module 4 which is labeled "Conditional Release through the Liberty Conditional Release Program (CONREP)" for those SVPA detainees civilly committed pursuant to the SVPA, and "Community Reintegration" for those SVPA detainees not civilly committed pursuant to the SVPA. Thus, the DSH acknowledges that by reaching SOTP Module 4 its SVPA detainees are (1) no longer a danger to the public in that they can be safely treated in the community[3], and (2) they no longer require any inpatient treatment. (See Exhibit A - DSH's official Description of the SOTP, pages 17-18)

17. In order for a civilly committed SVPA detainee to reach SOTP Module 4, the CSH Medical Director, Chief of Psychology, the Director of the SOTP (i.e. the most senior treatment supervisors within the facility), and a representative of the DSH's Conditional Release Program ("CONREP") are required to conduct a thorough assessment of the detainee. (See Exhibit A - DSH's official Description of the SOTP, page 17) Said

---

[2]   These two purposes, for civil detention pursuant to the SVPA, were identified by the California Legislature (California Senate Legislation: Sec.1 of Stats. 1995, c. 762 (S.B. 1143)), and by the California Supreme Court (*People v. McKee* (2010) 47 Cal.4th 1172,1189)

[3]   Those individuals civilly committed pursuant to the SVPA, who reached SOTP Module 4 would be required to be supervised while being treated within the community within the DSH's Condition Release Program (CONREP). Those individuals not civilly committed pursuant to the SVPA, who reached SOTP Module 4 would not be required to be supervised while being treated within the community.

assessment includes, but is not limited to, reviewing the SVPA detainee's mental health charts, consulting with his treatment providers, reviewing his treatment work, and interviewing said detainee. For the SVPA detainee to successfully be advance to SOTP Module 4, these supervisors must unanimously deem that the SVPA detainee is suitable for "community reintegration". (See Exhibit A -  DSH's official Description of the SOTP, page 17)

18. On, or about, September 23, 2020 the CSH Medical Director, the CSH Chief of Psychology, the Director of the SOTP, and a representative of the DSH's CONREP unanimously deemed Plaintiff was suitable for advancement to "Module 4: Conditional Release through the Liberty Conditional Release Program (CONREP)" of the DSH's SOTP.

19. Defendant Clandenin, and Defendant Price, have deemed the CSH's restrictive prison-like conditions of confinement are required to manage those SVPA detainees who, unlike Plaintiff, have *not* been rehabilitated sufficiently to have completed the inpatient SVPA treatment program. Said restrictive conditions include, but are not limited to, the following:

(i) detainees being prohibited from possessing cell-phones - which is a restriction that is <u>identical</u> to that experienced by California Department of Corrections and Rehabilitation (herein "CDCR") prisoners;

(ii) detainees being prohibited from possessing personal computers - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(iii) detainees being prohibited from having any access to the internet resulting in a prohibition of sending/receiving emails, conducting up to date legal research, locating advocates, meeting and communicating with people on social media websites, accessing online documentaries and movies, and otherwise being denied

access to the source of the overwhelming majority of information that exists within the world - which is a restriction that is <u>more restrictive</u> than that experienced by CDCR prisoners who are permitted limited internet access,and is likewise <u>more restrictive</u> than that experienced by California's Federal prisoners who are permitted limited internet access;

(iv) detainees being prohibited from possessing any devices capable of accessing the internet- which is a restriction that is <u>more restrictive</u> than that experienced by CDCR prisoners who are permitted tablets that have internet access;

(v) detainees being prohibited from possessing any storage devices including, but not limited to, hard drives, solid state drives, thumb drives, and secure data chips - which is a restriction that is <u>more restrictive</u> than that experienced by CDCR prisoners who are permitted storage of data on tablets;

(vi) detainees being prohibited from having a private bedroom - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(vii) detainees being prohibited from having a private restroom - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(viii)  detainees being prohibited from having a private shower/bath room with the ability to adjust the water temperature, and with a conventional shower-head - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(ix) detainees being prohibited from having a kitchen with an oven, a stove, a microwave, a fridge, and a freezer - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(x) detainees being required to consume prison-grade meals issued by CSH staff as opposed to being permitted to prepare their three daily meals with groceries they

have purchased - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(xi) detainees being prohibited from having "Day Passes" wherein they are able to leave the DSH facility grounds either with, or without, supervision during the day - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(xii) detainees being prohibited from possessing normal clothing as opposed to being forced to wear a prison-style uniform that is identical to that which is worn by California Department of Corrections and Rehabilitation (herein "CDCR") prisoners imprisoned at CSH except for the absence of the words "CDCR Prisoner" marked thereon - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(xiii) detainees being prohibited from possessing their own vitamins and medication - which is a restriction that is <u>more restrictive</u> than that experienced by CDCR prisoners who are permitted to purchase vitamins and to have "keep on person" medication;

(xiv) detainees being prohibited from possessing any metal items larger than 1.5 inches including, but not limited to, nail clippers, scissors, and kitchen utensils - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(xv) detainees being prohibited from possessing any glass material - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(xvi) detainees being prohibited from possessing any wooden material - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(xvii) detainees being prohibited from possessing a conventional mattress, and instead being forced to use a plastic covered foam "mattress" - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(xviii) detainees being prohibited from having privacy irrespective of whether they are sleeping, eating, or showering as DSH staff, and other DSH detainees, are able to observe them at all such times - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(xix) detainees being prohibited from locking their bedroom, shower/bath room, and restroom doors - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(xx) detainees being subjected to intrusive supervision by DSH staff throughout each day - which is a restriction that is <u>more restrictive</u> than that experienced by CDCR prisoners;

(xxi) detainees being prohibited from having adequate access to law library material crucial to vindicating their rights including, but not limited to, prohibited from have access to up to date case law in each of the courts throughout the nation, prohibited from having access to any college/university law reviews, prohibited from having access to the American Law Review, and prohibited from having access to any online updated legal text books - which is a restriction that is <u>identical</u> to CDCR prisoners, and <u>more restriction</u> than that experienced by California's Federal prisoners who are permitted all of the above access;

(xxii) detainees being prohibited from having full-time jobs paying at least "minimum wages" - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(xxiii) detainees being prohibited from having private visits with their family members and loved ones - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(xxiv) detainees being forced to spend their entire day in the presence of strangers - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(xxv) detainees being prohibited from having a choice of their medical health care providers - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(xxvi) detainees being prohibited from sleeping in darkness - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(xxvii) detainees being prohibited from having their clothing adequately cleaned - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(xxviii) detainees being prohibited from using a washing machine to wash their clothing - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(xxix) detainees being prohibited from having a personal television with either cable or satellite television access - which is a restriction that is <u>more restrictive</u> than that experienced by CDCR prisoners;

(xxx) detainees being prohibited from attending religious services at a facility of their choice - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners;

(xxxi) detainees being prohibited from having personal living quarters that are commiserate with community standards (i.e. at least 600 square feet) - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners; and

(xxxii) detainees being forced to live with detainees who are cruel, and dangerous who have not internalized skills to adequately regulate their behavior - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners; and

(xxxiii) detainees being forced to reside within personal living quarters that are less than 70 square feet - which is a restriction that is <u>identical</u> to that experienced by CDCR prisoners.

20. Defendant Clandenin, and Defendant Price are aware, or should be aware, that the Fourteenth Amendment to the United States' Constitution prohibits Plaintiff being subjected to punishment while in the custody of Defendants[4]. Defendant Clandenin, and Defendant Price are aware, or should be aware, that as SVPA civil detention infringes on Plaintiff's fundamental liberty interests, to satisfy the Fourteenth Amendment Defendants must ensure the infringement is narrowly tailored to serve a compelling state interest[5]. Defendant Clandenin, and Defendant Price are aware, or should be aware, that conditions of confinement are presumed to violate the Fourteenth Amendment when said conditions are identical to, similar to, or more restrictive than, those in which criminals serving sentences are held[6]. Defendant Clandenin, and Defendant Price are aware, or should be aware, that punitive conditions of confinement, contrary to the Fourteenth Amendment, are any conditions that are excessively restrictive in relation to the purposes of civil detention[7]. Defendant Clandenin, and Defendant Price are aware, or should be aware, that the Fourteenth Amendment demands that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is civilly detained[8]. Defendant Clandenin, and Defendant Price are aware, or should be aware, that the Fourteenth Amendment dictates that Plaintiff's conditions of confinement need to be in accord with the

---

[4]  Unlike someone serving a criminal sentence, a civil detainee may not be *punished.* (*Jones v. Blanas* (9th Cir. 2004) 393 F.3d 918 citing *Bell v. Wolfish* (1979) 441 U.S. 520, 535) "The more protective fourteenth amendment standard applies to conditions of confinement when detainees… have not been convicted" of a crime. (*Gary H. v. Hegstrom* (9th Cir. 1987) citing *Youngberg v. Romeo* (1982) 457 U.S. 307, and *Bell v. Wolfish* (1979) 441 U.S. 520)

[5]  *Washington v. Glucksberg* (1997) 521 U.S. 702, 721

[6]  *Jones v. Blanas* (9th Cir. 2004) 393 F.3d 918 citing *Sharp v. Weston* (9th Cir. 2000) 233 F.3d 1166, 1172-73 citing  *Youngberg v. Romeo* (1982) 457 U.S. 307

[7]  *Jones v. Blanas* (9th Cir. 2004) 393 F.3d 918 citing  *Bell v. Wolfish* (1979) 441 U.S. 520, 538

[8]  *Jackson v. Indiana* (1972) 406 U.S. 715, 738

Plaintiff's *current* requirements; as even if the initial restrictive conditions were permissible, those same restrictions may not constitutionally continue after the basis for them no longer exist, such as if the Plaintiff has recovered from his mental condition or if he is no longer a danger to the public[9].

21. Defendant Clandenin, and Defendant Price are aware, or should be aware, that irrespective of whether at some point the highly restrictive conditions, noted in paragraph 19 above, may have been rationally related to Plaintiff prior to his having been deemed by DSH to be rehabilitated, none of said highly restrictive conditions are in accord with what Defendant Clandenin, and Defendant Price acknowledge, through the DSH SOTP they play a significant role in administering, is *currently* appropriate for Plaintiff now that he has reached SOTP Module 4. Specifically, Defendant Clandenin, and Defendant Price are aware, or should be aware, that none of such restrictive conditions exist, and are thus deemed necessary, within DSH's SVPA conditional release program[10] (herein "CONREP") administered by Defendant Clandenin, or exist for those who have been released by Defendant Price from CSH without the requirement of CONREP. Defendant Clandenin, and Defendant Price are aware, or should be awar, that in accord with DSH's supervisors accurately recognizing the fact SOTP Module 4 SVPA detainees do not require the harsh prison-like restrictive conditions, as noted in paragraph 19 above, not one SVPA detainee who has ever been released into the SVPA CONREP outpatient treatment program has ever been convicted of a sexually violent offense subsequent to being released into said outpatient SVPA treatment program.

22. Defendant Clandenin, and Defendant Price are aware, or should be aware, that transitional housing, with conditions that mirror those afforded to SVPA DSH outpatients and thus include none of the prison-like restrictions noted in paragraph 19 above, located

[9]  *Foucha v. Louisiana* (1992) 504 U.S. 71, 77
[10]  Pursuant to California's Welfare and Institutions Code § 6608

within the secure boundaries of Coalinga State Hospital, or within the boundaries of another state hospital, would be a reasonable, and less harsh, method of confining Plaintiff while he awaits court ordered release. Defendant Clandenin, and Defendant Price are aware, or should be aware, that the state provides DSH with over $240,000 per year for the care of Plaintiff, and that for a small fraction of said funds, the DSH would be able to do the following:

(i) have a small inexpensive mobile home installed on DSH property for Plaintiff to live in;

(ii) have a GPS ankle-bracelet installed on Plaintiff's ankle;

(iii) have Plaintiff's GPS ankle-bracelet independently monitored by a competent agency;

(iv) have DSH psychiatric technicians communicate with Plaintiff's employers, and otherwise supervise Plaintiff during his daily Day Passes;

(v) have cable or satellite television installed for Plaintiff's use;

(vi) provide Plaintiff with access to DSH's existing internet provider;

(vii) provide Plaintiff with home appliances (washing machine, dryer, microwave, oven, stove, and dish washing machine); and

(viii) otherwise provide for Plaintiff to live a normal life with the exception of his residing on DSH grounds, and subject to conditions of supervision that are not excessively restrictive.

23. Despite the facts noted above, Defendant Clandenin, and Defendant Price, have failed to provide any form of transitional housing less restrictive than those prison-like conditions noted in paragraph 19, for those SVPA detainees, including Plaintiff, who have advanced to the community reintegration stage of DSH's SVPA treatment program.[11]

---

[11]  Restrictions violate the Fourteenth Amendment if said restrictions are "employed to achieve  objectives that could be accomplished in so many alternative and less harsh methods." *(Jones v. Blanas* (9th Cir. 2004) 393 F.3d 918 citing *Hallstrom v. City of Garden City* (9th Cir. 1993) 991 F.2d

Defendant Clandenin, and Defendant Price have instead subjecte SOTP Module 4 detainees, including Plaintiff, to conditions that are excessively restrictive in relation to the two purposes of the SVPA, noted in paragraph 14[12]. As the DSH acknowledges less restrictive conditions of confinement are appropriate for SVPA detainees in SOTP Module 4, as noted in paragraph 21 above, this failure is a flagrant and wanton disregard to the fact subjecting Plaintiff to said excessively restrictive conditions results in Plaintiff being subjected to unjust punishment contrary to the Fourteenth Amendment.

24. Defendant Clandenin, and Defendant Price are aware, or should be aware, that in order to satisfy the Fourteenth Amendment, they must provide Plaintiff with individualized treatment that affords Plaintiff with a realistic opportunity to be cured and released from his civil commitment[13]. Defendant Clandenin, and Defendant Price are aware, or should be aware, that by reaching SOTP Module 4 DSH has acknowledged that Plaintiff's individualized treatment needs, in order for him to be deemed to no longer require civil commitment, require Plaintiff be provided with *outpatient* treatment so that Plaintiff is permitted to practice his skills in the community under supervision. Despite these facts, Defendant Clandenin, and Defendant Price are withholding this required individualized treatment by prohibiting Plaintiff from taking part in *outpatient* treatment while he resides within transitional housing on DSH property.

## VIII. VIOLATIONS ALLEGED

### COUNT ONE:

### Failure to Provide Non-Punitive Housing Amounts to a Violation of the Due Process Protections of the Fourteenth Amendment to the United States Constitution

1473, 1484 quoting *Bell v. Wolfish* (1979) 441 U.S. 520, 438)

[12] Said purposes are: (1) the protection of the public, and (2) Plaintiff being afforded treatment the state deemed was required to ensure he was rehabilitated such that he was no longer a danger to the public. (Noted by California Senate Legislation: Sec.1 of Stats. 1995, c. 762 (S.B. 1143)), and the California Supreme Court: *People v. McKee* (2010) 47 Cal.4th 1172,1189)

[13]     *Oregon Advocacy Ctr. v. Mink* (9th Cir. 2003) 322 F.3d 1101, 1121

*Civil Rights Complaint  - 42 U.S.C. § 1983*

25. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 23 as if fully set forth herein.

26. The egregious and flagrant acts and omissions alleged in paragraphs 20 through 23 constitute a custom or practice that violates the federal rights, as protected by the Fourteenth Amendment to the Constitution of the United States, of Plaintiff who is an individual confined at DSH's CSH.

27. Due process further requires that the nature and duration of confinement bear a reasonable relation to the purpose for which a person is committed.

28. The conditions of confinement imposed by Defendants on Plaintiff bare no rational relationship to the purpose of detaining someone, such as Plaintiff, whom the DSH concedes is suitable for conditional release, and are such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the conditions imposed are not based on professional judgment.

29. Unless restrained by this Court, Defendants will continue to engage in the egregious and flagrant acts and omissions set forth in paragraphs 20 through 23 that deprive Plaintiff of rights, privileges, or immunities secured or protected by the Constitution of the United States, and will cause irreparable harm to Plaintiff.

## COUNT TWO:

### Failure to Provide Adequate Treatment Amounts to a Violation of the Due Process Protections of the Fourteenth Amendment to the United States Constitution

30. Plaintiff incorporates by reference the allegations set forth in Paragraphs 1 through 24 as if fully set forth herein.

31. The egregious and flagrant acts and omissions alleged in paragraph 24 constitute a custom or practice that violates the federal rights, as protected by the

Fourteenth Amendment to the Constitution of the United States, of Plaintiff who is an individual confined at DSH's CSH.

32. The Defendants' acts and omissions violate Plaintiff's Fourteenth Amendment due process right to such treatment as will give Plaintiff a realistic opportunity to be cured or to improve his mental condition by subjecting him to punitive, non-therapeutic conditions of confinement, and failing to provide adequate outpatient mental health programming tailored to address his particular needs.

33. The Defendants' failure to provide individualized and appropriate outpatient treatment to the Plaintiff prevents him from meeting the statutory criteria for release from SVPA civil commitment.

34. Due process further requires that the nature and duration of confinement bear a reasonable relation to the purpose for which a person is committed.

35. The nature of Plaintiff's continued confinement by the DSH does not bear a reasonable relation to the purpose for which Plaintiff was committed namely SOT treatment.

36. Defendants' provision of care and treatment to Plaintiff is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the conditions
imposed are not based on professional judgment.

37. Unless restrained by this Court, Defendants will continue to engage in the egregious and flagrant acts and omissions set forth in paragraph 24 that deprive Plaintiff of rights, privileges, or immunities secured or protected by the Constitution of the United States, and will cause irreparable harm to Plaintiff.

## IX. PRAYER FOR RELIEF

38. Plaintiff is authorized under 42 U.S.C. § 1983 to seek equitable and declaratory relief. **WHEREFORE, Plaintiff prays that this Court enter an order:**

a. Declaring that the acts, omissions, and practices of Defendants set forth in paragraphs 18-24 above constitute a custom or practice of resistance to the Plaintiff's full enjoyment of rights, privileges or immunities secured or protected by the Fourteenth Amendment to the Constitution of the United States, and that those acts, omissions and practices violate the Fourteenth Amendment to the Constitution of the United States; and

b. Permanently enjoining Defendants, their officers, agents, employees, subordinates, successors in office, and all those acting in concert or participation with them, from continuing the acts, omissions, and practices set forth in paragraphs 18-24 above, and that this Court require Defendants to take such actions as will ensure lawful conditions of confinement, and adequate individualized treatment, are afforded to Plaintiff; and

c. Granting such other and further relief as the Court may deem just and proper.

Dated: September 10, 2022               Respectfully submitted,

_____

Plaintiff *in Pro Se*

E X H I B I T   "A"

# Department of State Hospitals - Coalinga

# SEX OFFENDER TREATMENT PROGRAM (SOTP) PROGRAM DESCRIPTION

Revised 2016

## Table of Contents

**Content**  **Page**
A.  RNR Principles — 3
B.  Program Structure — 3
  1.  Program Modules — 4
  2.  SOTP Psychotherapy Groups — 4
  3.  Individual Therapy — 5
  4.  Facilitator Competency Qualifications — 5
  5.  Clinical Treatment Assessment — 5
  6.  Treatment Review/Consultation Panel — 6
  7.  Treatment Review/Advancement Panel — 6
  8.  Group Absenteeism — 7
  9.  Taking Responsibility for Sexual Offenses — 7
  10. SOTP Certificates — 7
C.  SOTP Curriculum — 7
  1.  Module I: Treatment Readiness Module — 7
    a)  Beginning Module II: Self-Regulation / Better Life — 8
    b)  Procedure — 8
  2.  Module II: Self-Regulation / Better Life — 9
    a)  Content Areas — 9
    b)  Transitioning from Phase II and Phase III of the Old Program to the Revised Program — 12
    c)  Criteria for Matriculating to Module III: Treatment Integration and Community Preparation — 12
    d)  Procedure for Matriculating to Module III: Treatment Integration and Community Preparation — 13
    e)  Treatment Review Panel Process — 14
  3.  Module III: Treatment Integration and Community Preparation — 15
    a)  Content Areas — 15
    b)  Criteria for Advancing to Module IV: Community Reintegration — 16
    c)  Procedure for Advancing to Module IV: Community Reintegration — 17
  4.  Module IV: Community Reintegration Module through the Liberty Conditional Release Program (CONREP) — 18
D.  References — 19

# Sex Offender Treatment Program

The revised DSH-C SOTP incorporates components of the *Self-Regulation/Better Life (SR/BL)* models and complies with Risk-Need-Responsivity (RNR) principles. These models are integrated into a combined approach to strengthen an individual's self-regulation skills and to prepare him for a better life free of sexual offending. The fundamental goal of the program is for the individual to acquire pro-social skills and to prevent recurrence of sexual offending

## A. Risk-Need-Responsivity (RNR) Principles

The *risk principle* involves matching the intensity of treatment to the individual's risk level of reoffending, with high-risk offenders receiving more intensive and extensive treatment than low-risk offenders. Offense risk is determined by the combination of static and dynamic risk factors.

The *need principle* focuses on assessing criminogenic needs or dynamic risk factors (DRFs) and targeting them in treatment. DRFs are defined as enduring but changeable features of an offender; are amenable to interventions and when successfully addressed, result in a decrease in recidivism risk.

The *responsivity principle* states that services should be delivered in a manner that is engaging and consistent with the learning style of the individual. Examples include fostering strengths; establishing meaningful relationships; and attending to relevant characteristics such as age, cognitive skills, cultural factors, and emotional regulation issues. It also states that the primary treatment components should use social learning and cognitive-behavioral approaches.

Empirical studies indicate that adhering to RNR principles can maximize treatment effects and reduce recidivism.

Treatment progress is indicated by, but not limited to, an individual successfully completing primary content areas (groups that address evidence-based dynamic risk factors), demonstrating pro-social behaviors and complying with treatment objectives. Specialized assessment techniques, including psychophysiological measures such as polygraph examinations and penile plethysmograph (PPG) tests are used.

The *SR/BL* model also provides some educational opportunities, vocational services, and recreational activities. Individuals with intellectual disabilities or severe psychiatric disorders participate in programs adapted for their treatment needs.

The *SR/BL* model is introduced in *Module I: Treatment Readiness*, which describes the various treatment components, and is followed by three treatment modules: *Module II: Self-Regulation/Better Life*, *Module III: Treatment Integration and Community Preparation*, and *Module IV: Community Reintegration*.

## B. Program Structure

### 1. Inpatient Program Modules

Module I: *Treatment Readiness* is designed to motivate and engage patients for treatment and to orient and inform them by providing an overview of the treatment program and the treatment process. It gives patients guidelines for maximizing the probability of treatment

success. The ultimate purpose is to instill hope, provide encouragement and improve self-confidence. Treatment readiness relies on several key concepts, including motivational interviewing, developing a collaborative relationship with the individual, assessing readiness to change, and identifying any responsivity issues.

Module II: *Self-Regulation/Better Life* consists of a variety of psychoeducational and process groups that address an individual's dynamic risk factors, provide guidelines for identifying pathways to sexual offending, and developing self-regulation skills as well as victim awareness. Separate content areas for addressing cognitive, emotional, and behavioral self-regulation are provided. In addition, problem solving techniques are taught and integrated into the offense progression pathway and self-regulation content areas. Psychoeducational sections are designed to teach patients about a broad spectrum of topics that have applications in self-regulation and for attaining goals to build a better life. Process treatment sections are designed to internalize the knowledge learned in the psychoeducational groups and generalize the acquired skills for daily living.

Module III: *Treatment Integration and Community Preparation* helps individuals to develop an integrated *Self-Regulation / Better Life* plan. The primary goal is to improve community safety and prevent future victimization by refining self-regulation skills and identifying positive goals leading to a pro-social life. The *Treatment Integration and Community Preparation* module targets community reintegration needs for all patients, regardless of whether they re-integrate into the community through conditional or unconditional pathways. Treatment groups focus on developing risk management skills, social support, personal autonomy, community resources and opportunities.

## 2. SOTP Psychotherapy Groups

Psychotherapy groups involve *psychoeducational* and *process* components. SOTP core groups meet twice a week for 1.5 hours per session. In general, group size can be anywhere from five to nine participants.

The *psychoeducational* component teaches patients about a broad spectrum of topics that have applications in self-regulation and building a better life by developing meaningful, long-term goals and acquiring the requisite skills to attain them. These sessions are didactic and focused on the patient acquiring information that is intended to be learned via cognitive-social learning principles.

The *process* groups are used to internalize the knowledge learned in the psychoeducational sessions and apply the acquired skills in day-to-day living. This is done by completing homework assignments related to the psychoeducational classes and discussing the homework while receiving feedback from fellow group members and group facilitators.

Group facilitators determine group objectives, provide consistent structure and rationale for each group session, and consider responsivity factors of the various group members. Group facilitators may also help patients rehearse acquired skills, model appropriate behavior, assign role-playing of appropriate behaviors, and examine changes in personal identity.

## 3. Individual Therapy

Time-limited, individual cognitive-behavioral therapy may be provided in addition to group

therapy, especially to address *treatment-impeding factors* such as anxiety, depression, group absenteeism, inappropriate group behavior, crisis intervention, etc. Other unique issues or concerns may also warrant individual therapy. The Chief of Psychology or designee will review referrals for individual therapy. Decisions regarding individual therapy will be made by considering clinical necessity and hospital resources.

## 4. Facilitator Competency Qualifications

Primary group facilitators must have a Master's degree or above in counseling, marriage and family therapy, psychology, psychiatry, social work or closely related field and demonstrated knowledge and clinical experience in the treatment of sex offenders. Co-facilitators must have an associate's degree or above, individual and group counseling skills, and demonstrated knowledge and understanding of sex offender treatment practices. SOTP facilitators adhere to the highest clinical standards including, but not limited to, those defined in state laws, hospital directives, ethical principles, and discipline codes of conduct. Facilitator competency is assured through periodic self-assessments, initial and ongoing training requirements, group oversight, and supervision. Facilitators interested in developing new areas of competency must seek and receive appropriate training and supervision that addresses the new area of interest before providing treatment.

## 5. Clinical Treatment Assessments

The SOTP specific assessments are designed to assess dynamic risk factors identified by the *Structured Risk Assessment* (SRA)/ STABLE-2007 or other standardized risk assessment instruments and related progress determined by a Stage of Change rating for each identified factor. These assessments will incorporate findings from the risk assessment instruments, treatment stages of change rating scales, and other ancillary treatment measures. Clinical Assessments will be administered, at a minimum, at intake, prior to advancing to the Treatment Integration and Community Preparation module, and prior to advancing to the Community Reintegration module. The SOTP specific assessments may be additionally administered as clinically indicated.

Treatment progress ratings include the results of the *Therapist Rating Scale-2* (TRS-2) and the *Sex Offender Treatment Intervention and Progress Scale* (SOTIPS).

The TRS-2 is administered by SOTP facilitators and assesses the patient's intellectual understanding of risk-related concepts (i.e., How much the patient knows?) and emotional acceptance/demonstration of the item (i.e., How much is internalized? Is the patient "walking the walk?"). The results will be reviewed during individual sessions with each patient. This assessment will be administered approximately midway through treatment and at the end of treatment—or additionally as clinically indicated.

The SOTIPS is a behavioral progress scale that looks at factors such as cooperation with treatment, sexual risk management, criminal rule-breaking attitudes, etc. The SOTIPS will be administered in an interdisciplinary fashion within the context of the treatment team and unit milieu on an annual basis. Treatment team members will review the progress ratings with patients during their team meetings.

Ancillary measures of treatment progress include PPG tests, a Visual Reaction Time (VRT)

test and polygraph assessments. The PPG assessments indicate the degree of sexual arousal to various stimuli considered inappropriate or deviant such as children or violent sexual behavior. The Visual Reaction Time tests assess the degree of sexual interest to various non-sexual visual images include adults, pubescent and prepubescent children. These assessments will be completed at regular intervals.

The different assessment methods allow for greater breadth of observation and assessment in order to present a more accurate picture of overall functioning and treatment progress. Results of these assessments are incorporated into the Treatment Plan and on Psychology Assessment templates, which are printed and filed in patient charts.

DSH-C Forensic Department evaluators will conduct annual reviews to determine whether the committed patient currently meets the definition of a sexually violent predator. Annual evaluations consider whether the patient qualifies for one of the following releases:

- a conditional release to a less restrictive alternative;

- an unconditional release to a less restrictive alternative; or

- an unconditional release where conditions can be imposed on the patient that would adequately protect the community.

The purpose of Annual DSH-C Forensic evaluations is to provide documentation to the courts which weighs community safety against any evidence of mitigation of risk due to progress in treatment and/or the identification of previously unconsidered protective factors.

6. Treatment Review / Consultation Panel

The purpose of the *Treatment Review / Consultation Panel* is to evaluate the extent of treatment progress and identify issues that impede or interfere with progress. In general, the panel will meet on an as needed basis and review patients when the following conditions occur: conflict between patient and treatment provides that cannot be resolved in a more informal manner; disagreement amongst treatment providers regarding patient's treatment progress or readiness for advancement; or persistence of treatment interfering factors that have not responded to established interventions.

7. Treatment Review Advancement Panels

The purpose of the *Treatment Review Advancement Panel* is to determine whether a patient meets the criteria for advancement to the next module of treatment. A patient's SOTP facilitators and Treatment Team will refer patients for a *Treatment Review Advancement Panel* when they agree a patient has satisfied the requirements of their current treatment placement and believe the patient is ready for advancement (i.e., Module II: *Self-Regulation/ Better Life* to *Module III: Treatment Integration and Community Preparation*, or from *Module III: Treatment Integration and Community Preparation* to *Module IV: Community Reintegration*). A standardized set of criteria and a panel consisting of impartial, multidisciplinary clinicians with demonstrated knowledge of the key components of the program will evaluate the patient's progress using outcome measures, such as feedback from treatment team members and group facilitators; demonstrated pro-social behaviors; treatment objective compliance; polygraph

examinations; PPG and/or VRT results; SOTIP assessments; and TRS assessments.

## 8. Group Absenteeism

Group members with three unexcused absences per quarter will be required to complete the content areas and missed homework assignments. SOTP facilitators and Treatment Team members are expected to meet with patients to review their motivation and readiness for treatment. Patients may be removed from the SOTP group roster for non-attendance and can rejoin an SOTP group at any time. A *Treatment Consultation Panel* may be convened as needed to determine group placement or assist with addressing motivational issues.

## 9. Taking Responsibility for Sexual Offenses

Patients are expected to take responsibility for their offenses by presenting an "active account" of their offenses and addressing the factors related to their offenses in treatment. Those who minimize their offenses may be given special assignments related to increasing victim awareness. A specific group for Victim Awareness is available that includes assignments related to developing an understanding of both the short and long-term effects and the victim's experience.

## 10. SOTP Certificates

The purpose of the *SOTP certificates* is to provide recognition for achievements and motivate patients for ongoing successes in completing SOTP content areas. The certificates will also provide documentation and consistency in recording patient's completed work in the event of facilitator and/or group changes. Patients will be provided with certificates for each content area within the treatment program, which will identify whether the patient has completed all required assignments, has a good understanding of the content areas, and/or demonstrates adequate skills in their daily life related to the content areas. The patient's facilitators and Treatment Team will agree upon and make a request for certificates in each content area.

## C. SOTP Curriculum

### 1. Module I: Treatment Readiness

The *Treatment Readiness* group provides an overview of the sex offender treatment program, incorporates lessons to motivate patients in treatment, and more importantly, provides them with guidelines to maximize their probability of success. This group is psychoeducational and meets for 1.5 hours twice a week for 12 weeks. Group enrollment is open-ended, and new participants may be added continuously as space permits. After completing the psychoeducational learning blocks, group participants are expected to be familiar with the treatment program and develop an understanding of treatment concepts, means of progress, and evaluation.

The *Values in Action (VIA)* group is derived from the field of positive psychology and is focused on assessing strengths and virtues, as well as promoting positive individual characteristics, emotions, and institutions. This group is psychoeducational and process-oriented, and meets for 1.5 hours twice a week for 12 weeks. The psychoeducational component focuses on a specific topic. The process component includes positive coaching

and strength-building opportunities. At the end of the quarter, group participants are expected to demonstrate an understanding of their signature strengths. This group can be attended concurrently with the *Treatment Readiness* group.

a. **Beginning Module II: Self-Regulation/Better Life**

To begin Module II: *Self-Regulation/Better Life*, the patient must meet the following criteria:

(1) Completion of Module I: Treatment Readiness, which provides general knowledge regarding DSH-C's SOTP.

(2) Awareness of assessment procedures, treatment progress, self-regulation, building a better life, Welfare and Institutions Code section 6600 law, dynamic risk factors, and stage of change ratings.

(3) Opportunity to sign the SOTP consent form.

(4) An assessment of the patient's relevant dynamic risk factors completed at intake or a referral from the treatment team to the psychology assessment center for evaluation.

(5) An acknowledgment and commitment to adhere to group norms and ethics.

b. **Procedure**

(1) When the patient is close to completing the *Treatment Readiness* groups, the treatment team will schedule a *Treatment Readiness* conference. This conference will include at least two of the enduring team members and a representative from the psychology assessment center. The patient can petition the team to hold a *Treatment Readiness* conference at any point.

(2) Prior to the conference, the treatment team should ensure that the following items are addressed and integrated into the treatment plan:

- Necessary accommodations for patients with intellectual challenges.

- Dynamic risk factors under the "Barrier to Discharge" tab.

- Patient strengths under the "Intervention and Response" tab. The strengths should be updated as the patient engages in treatment and as the Values in Action-Inventory of Strengths (VIA-IS) results are reviewed.

- Violence risk assessment results under the "Risk Factors" tab.

- Non-criminogenic needs that might affect successful treatment of criminogenic needs are addressed before, or in conjunction with, criminogenic needs. For example, intellectual deficits, excessive social anxiety, or current mood disorders might effect a person's current treatment engagement.

(3) The conference's content will be guided based on the criteria set forth for entering Module II: *Self-Regulation/Better Life*. A semi- structured interview of the patient will be used to assess an acceptable understanding or awareness of treatment components.

(4) The treatment team will clarify the purpose of informed consent to ensure that the patient understands the primary treatment components of the SOTP, and will provide an opportunity for the patient to sign the informed consent for treatment. The consent form shall be filed in the medical record under the "Consent" tab, and the patient shall receive a copy. Refusing to sign the consent form will not prohibit the patient from enrolling and participating in sex offender treatment groups. However, the patient must indicate that he or she has been informed of the nature of the program, and understands the contents and expectations for SOTP participants. A narrative verifying consent or declining to sign the consent form should be made in the "Interdisciplinary Notes" or "Psychology Progress Notes" section of the clinical chart. If the patient declines to sign the consent, then "declined to sign" will be written on the consent form signature line, along with a note that the patient understands the nature of the SOTP and indicates he or she wants to participate in the program. The signature of a witness should also be obtained.

(5) Upon successfully completing the *Treatment Readiness* conference, the treatment team will submit a referral to the Psychosocial Rehabilitation Mall Coordinator, who will enroll the patient in the SOTP Module II: *Self-Regulation/Better Life* core group. The mall coordinator or designee will inform the group facilitators prior to the first meeting so that they may prepare the group for a new member. The SOTP Director or designee will grant a certificate to the patient acknowledging his or her dedication to treatment.

(6) If the treatment team determines that the patient is not ready for Module II: Self-Regulation/Better Life at this time, they should recommend what treatment-interfering issues the patient needs to address that will allow him or her to benefit from the SOTP. This may include short-term individual counseling or other therapeutic procedures addressing specific treatment-interfering issues. Every effort should be made to help the patient begin treatment.

(7) If the TxT decides a patient is ready for treatment, TxT members will identify an SOTP group that has availability and enroll the patient. Before entering group for the first time, the patient and at least one member of the TxT will meet with group facilitators in order to review dynamic risks and discuss initial treatment goals. This will allow the group facilitators to prepare the group for the entrance of a new member.

## 2. Module II: Self-Regulation/Better Life

### a. Content Areas

The primary content areas in *Module II: Self-Regulation/Better Life* includes the following: *Building a Better Life*, Dynamic Risk Factors, *Offense Progression Chain*, *Problem-Solving*, *Behavioral Self-Regulation*, *Cognitive Self-Regulation*, *Emotional Self-Regulation*, and *Victim Awareness*. Patients will also be offered ancillary groups that target specific dynamic risk factors. In general, each content area is designed to be completed in 12–24 weeks. Groups meet two times a week, once for psychoeducational presentations and homework assignments, and

once to process the information gleaned from the homework assignments. The content areas are also offered as independent mall groups to allow patients a chance to complete missed work or retake any topic. In addition to the primary content areas, there are individualized dynamic risk factor groups that patients may be required to complete. Facilitators are encouraged to be flexible, and when applicable, use professional discretion to accommodate individual needs. Some of the content areas must be successfully completed before a patient takes another content area group.

(1) *Building a Better Life* is based on the notion that humans universally seek some goals called "Common Life Goals" in order to achieve a fulfilling life, and that treatment should attempt to explain the origins of sexual offending and provide positive goals in addition to risk avoidance. The psychoeducational component focuses on specific common life goals, and flaws in obtaining these goals. Flaws may include inappropriate or harmful strategies to obtain a goal, lack of scope, conflict among goals, and lack of internal or external capabilities. The process component includes exercises to understand the goals that are important, the role of these goals in sexual offending, flaws, and how to incorporate these goals into building a better life.

(2) The *Dynamic Risk Factors* content area is designed to provide a foundation in understanding one's dynamic risk and to develop a plan to address these risks throughout the treatment program. The psychoeducational component aims to educate patients on each empirically supported dynamic risk factor that has been shown to increase sexual recidivism and to assist patients with identifying personally relevant dynamic risks. The process component includes exercises to aid in developing strategies to manage risks. Patients will begin to develop a plan addressing these risk factors and may be referred to ancillary groups to assist in targeting specific risk factors.

(3) The psychoeducational component in the *Offense Progression Chain* describes the 10 steps or phases that occur in the sexual offense process. It replaces the offense cycle used in Relapse Prevention (RP) and differs from the RP cycle in that it includes differential goal selection; differential strategy selection; four different offending pathways instead of the one pathway included in RP; post-offending reflection; and post-offending intentions regarding future offending. The process component includes exercises designed to raise awareness of how different life experiences predispose a person to specific patterns of offending.

(4) *Problem-Solving* aims to foster an adaptive orientation to the problems of living, and teaches cognitive-behavioral skills to solve or cope with stressful problems. The primary goal of this group is to enhance a positive or constructive orientation to problems and improve the skills by which a person attempts to find effective solutions. The psychoeducational component explains negative versus positive problem orientations and three problem-solving styles, which include rationale, impulsivity/carelessness, and avoidance. The process component includes group exercises and activities, role-plays, and the utility of problem-solving tools in daily living.

(5) *Behavioral Self-Regulation* focuses on teaching a variety of techniques to avoid behaviors associated with offending including delay of gratification strategies, designing implementation intentions in carrying out goals, and techniques to understand and manage deviant and non-deviant sexual arousal. These techniques

come from classical and operant conditioning of sexual arousal and include masturbatory reconditioning, covert sensitization, and odor aversion. In masturbatory reconditioning, patients use deviant fantasies to achieve sexual arousal (in a private setting) and then switch to a non- deviant fantasy before the onset of ejaculation. Covert sensitization is a form of conditioning in which a deviant fantasy or behavior is paired with imaginary aversive consequences. Odor aversion involves self- inhalation of a noxious odor to suppress deviant sexual arousal. For patients who have difficulty extinguishing sexually deviant fantasies, a separate specialized group is available for focusing specifically on deviant fantasies.

(6) *Cognitive Self-Regulation* explains how certain schemata are manifested in offense-supportive beliefs. It is a shift from challenging cognitive distortions and eliminating excuse making, to understanding and addressing offense-justifying attitudes, thinking patterns, beliefs, and motivation. The psychoeducational aspect involves interactive presentations on how we understand ourselves, others, and the world; adaptive versus maladaptive beliefs; attachment styles; and relationships. The process groups involve group discussions related to the participants' understanding of how early life-attachment experiences, the behaviors of parents, and other background factors serve to influence the development of maladaptive schemata that influence interpretations of the world and our self-control in all aspects of life. Understanding the background factors that contribute to offending behavior allows the patient to target those maladaptive thinking habits that have supported sexual offending.

(7) *Emotional Self-Regulation* focuses on both emotion regulation and dysregulation. Emotion dysregulation is the inability to cope successfully with life experiences or the processing of emotions. Dysregulation may result in excessive emotional arousal or, conversely, deactivating emotions or "shutting down." Excessive emotions, e.g., intense anger, are associated with maladaptive behaviors and thoughts. The course is designed to teach patients how to keep emotions within a manageable range that allows them to behave in an "adaptive" fashion. "Adaptive" in this context means implementing coping strategies to enhance the recognition and processing of useful responses that increase productive functioning. Specific strategies for regulating emotions are taught and practiced, including assertion training, problem solving, and cognitive reappraisal. Emotional responses are tied to both cognitions and behavior.

(8) *Victim Awareness* commonly focuses on developing a cognitive and emotional understanding of another's experience, traditionally known as victim empathy or remorse. This is a topic with minimal research support for reducing sexual recidivism. However, the problem may be that it is quite difficult to truly measure someone's level of emotional empathy. Nonetheless, clinical reasoning and patient reports suggest that victim awareness is helpful and may prevent the recurrence of sexual offending. Future research will determine possible adjustments in this module, but at the present time, we are retaining victim awareness interventions. Group exercises may include writing an account of the offense from the victim's perspective, enabling group members to read the written accounts of victims of sexual abuse, writing an apology letter to the victim (but not delivering it), or using films that describe the harm caused to the victims of sexual assault.

(9) Special dynamic risk factor groups address individual needs such as substance abuse, criminal attitudes and beliefs, anger management, and interpersonal relationships. The treatment team will determine these groups based on several factors including

clinical interviews, assessment results, diagnoses, observation data, and any other barriers to discharge.

b. **Transitioning from Phase II and Phase III of the Old Program to the Revised Program**

Patients who completed most of the Phase II requirements or who were in Phase III during the transition program will not be required to start at the very beginning of the new program. Instead, a treatment manual will be offered that includes program changes that were not included in the original SOTP Phase Treatment program. Treatment program advances included in the three Self-Regulation groups (Cognitive, Emotion, and Behavior) will be offered to all patients meeting these criteria. Phase II facilitators will determine if a specific patient has sufficiently completed Phase II program requirements to qualify for this transition, or if the patient needs to complete one, two, or all three self-regulation modules.

c. **Criteria for Matriculating to Module III: Treatment Integration and Community Preparation**

The criteria used for a patient matriculating to the *Self-Regulation Maintenance* module include, but are not limited to, the following:

  (1)  Successfully completing the primary content areas of *Module II: Self-Regulation/Better Life* and individualized dynamic risk factor groups.

  (2)  Completing *Building a Better Life* assignments, which include:

  - Identifying common life goals that may have been involved in offense(s).

  - Identifying problematic strategies to achieving these goals.

  - Verbalizing pro-social means to achieving these common life goals.

  (3)  Completing a personal history and identifying background factors that affected his or her emotions and offense-supportive beliefs.

  (4)  Completing *Cognitive Self-Regulation* and understanding cognitions including underlying schemata, offense-supportive beliefs, emotions, and behaviors employed during offense progression; and completing the offense progression chain assignments for the most recent offense and for any other offense that followed a different offense pathway or a different type of victim.

  (5)  Completing *Emotion Self-Regulation* and understanding the role of emotions in motivating behavior, both adaptive and non-adaptive, and emotion-regulation strategies.

  (6)  Completing *Behavior Self-Regulation* and understanding basic learning principles and behavioral self-regulation strategies; and implementing the intentions to ensure strategies are consistently followed. Additionally, the participant must have a basic understanding of the principles and strategies

used to modify deviant sexual fantasies.

(7) Understanding and demonstrating effective problem-solving skills.

(8) Understanding how harmful behaviors affect victims and looking at the harmful behavior from the victims' perspective.

(9) Demonstrating sustained, pro-social behavior with no or minimal difficulty for one year.

(10) Demonstrating minimal or no need for improvement based on the SOTIPS.

(11) Demonstrating an adequate intellectual understanding of group content and emotionally incorporating these skills into daily living based on the *Therapist Rating Scale-2* (TRS-2).

(12) Passing a polygraph test verifying accounts of all pertinent information developed during the examination within the past 18 months. If the patient fails the polygraph or the test results suggest deception, additional work and/or processing will have to be completed to the satisfaction of the facilitators and treatment team.

(13) Completing a penile plethysmograph (PPG) test within the last 18 months. If deviant arousal was demonstrated, the patient must have demonstrated adequate coping and behavioral management skills. If the PPG test yields a "non-responder" profile and the patient passes a PPG Validation polygraph, a Visual Reaction Time Test (VRT) is completed. If Sexual Interest was demonstrated in prepubescent males or females, the patient must have demonstrated adequate coping and behavioral management skills.

(14) Completing a SOTP specific assessment showing the action or maintenance stage of change rating for identified dynamic risk factors.

(15) Achieving a low to moderate risk level on a violence risk assessment for identified dynamic risk factors.

d. **Procedure for Matriculating Module III: Treatment Integration and Community Preparation**

A Treatment Progress Referral to the Psychology Assessment Center for Advancement to Module *III: Treatment Integration and Community Preparation* will occur when the patient, the treatment team, and the SOTP group facilitators confer that the following items have been accomplished:

(1) The treatment team has referred the patient and the assessment center has completed the TNPA. The TNPA should be completed sometime during Module II: *Self-Regulation/Better Life*, and amended as necessary. The integrative findings should indicate that the patient's dynamic risk factors have been addressed, and that the patient is now at the action or maintenance stage of change for each

risk factor.

(2) SOTP facilitators have completed the TRS-2 indicating that the patient has demonstrated at least normative or is approaching normative functioning in terms of intellectual understanding and emotional acceptance/demonstration on each item.

(3) The treatment team has administered at least one SOTIPS assessment and agree that ratings for each item fall within the minimal or no need for improvement category or some need for improvement category. If more than one SOTIPS assessment has been completed, ratings should demonstrate improvements in level of functioning.

(4) The treatment team has assessed the patient at a moderate to low risk for violence.

(5) If clinically indicated, the assessment center has completed an updated PPG with results indicating non-deviant arousal patterns and/or appropriate arousal to consenting adult stimuli. If the PPG results suggest deviant arousal, the patient has developed a realistic plan to manage arousal patterns, participated in groups designed to help patient build skills in managing deviant arousal, and has demonstrated a commitment to using these skills. If patient is a non-responder (i.e., no arousal), a subsequent PPG Validation Polygraph must indicate no deception and the patient completes a VRT test with results indicating sexual interest in appropriate adult stimuli. If sexual interest in prepubescent children is suggested, the patient has demonstrated a realistic plan to manage his sexual interests, increase interest in adult partners, and demonstrates a commitment to using these skills.

(6) The treatment team has referred the patient, and at minimum, disclosures over sexual history and initial thoughts and fantasy polygraph assessments have been completed with results indicating no deception. If deception is indicated, the patient addresses these results with treatment providers to a satisfactory degree.

(7) The patient has provided a copy of his or her assignments (e.g., life history, building a better life plan, offense pathways, and problem-solving worksheet) and any additional therapeutic work done to the treating clinician who will provide copies of these documents and the TNPA to the SOTP treatment review analyst in the psychological assessment center.

e. **Treatment Review Panel Process**

(1) The treatment review analyst will coordinate a date, time, and place for a *Treatment Progress* review; select and notify a panel chair and two impartial SOTP facilitators; and provide copies of the patient's work to the panel for review. The treating clinicians and unit team will be notified. The chief psychologist, senior supervising psychologist, the clinical administrator, and the medical director will also be notified of the date and location of the *Treatment Progress* review—their presence is optional. Liberty HealthCare Corporation will also be notified and requested to attend.

(2) The SOTP facilitator will begin the review with a brief overview of the patient's course of treatment, assessment results, and progress, and address any questions. The patient will also be available to be interviewed by the panel, to present his or her treatment progress, and to answer questions.

(3) The panel will evaluate and determine whether the patient meets the criteria to advance to Module III: Treatment Integration and Community Preparation.

(4) The Panel Chair will note the results of the evaluation in the patient's chart under the "Psychology" tab. The clinical team leader will also note it in the treatment plan. Notes should capture decisions, current strengths, and future issues for the patient. If the panel determines that the patient is ready for advancement, the Panel Chair will notify the Mall Director of Promotion; a certificate of promotion will be printed; and the treatment team will enroll the patient in the SOTP Module III: *Treatment Integration and Community Preparation*. The patient's assignments and work will be returned to the treating clinician to be returned to the patient. A copy of the patient's work will also be delivered to the new group facilitator.

(5) If the panel determines that the patient is not ready for advancement at this time, they should recommend areas the patient needs to address to correct insufficiencies or outline the barriers to progress. This may include repeating a content area within a module, completing specific assignments, or completing a new group of assessments.

3.  **Module III: Treatment Integration and Community Preparation**

    The primary content areas in *Module III: Treatment Integration and Community Preparation* include *Personal Identity, Transitioning from Old Me to New Me Behaviors, Desisting from Offending, and community support and accountability planning with community reentry*. Patients in this module will also be referred for any necessary groups for individualized dynamic risk factors and Discharge Planning.

    a.  **Content Areas**

        (1) *Personal* Identity *will focus on the solidification of a "new me" personal identity that is free from offending. This section includes strengthening one's awareness regarding the change process and the importance of monitoring thinking and behavior until it becomes fully integrated into a "new me" personal identity. The focus for this section is with self-monitoring out in the community.*

        (2) *Identifying "Old Me" – "New Me" Conflicts* will focus on applying rational problem solving steps to obstacles that interfere with the transition to the "new me." It teaches patients how to integrate the information learned in treatment and practice self-regulation skills to manage unwanted "old me" tendencies and maintain "new me" tendencies out in the community. It will also discuss meaningful dynamic risk factors and assist patients with preparing for situations they may face out in the community.

(3) **Protective Factors and Desisting from Offending** will focus on identifying various strengths that have been shown to assist offenders from desist from offending. Patients will review their own strengths and identify how they can use their strengths to prevent re-offending when released back into the community.

(4) *Community support and accountability planning* will consist of each patient's need for both ongoing support and lifelong accountability. The RNR principles, the Containment Model, SVP Criterion C, and alternative placement will be discussed, along with managing dynamic risks (criminogenic needs) and stabilizing/destabilizing factors (non-criminogenic needs). The Liberty Healthcare Conditional Release Program (CONREP) will be outlined along with CONREP Terms and Conditions. Components of support and elements of accountability will be analyzed with a focus on cultivating appropriate resources in the community.

b. **Criteria for Advancing to Module IV: Community Reintegration through the Liberty Conditional release Program (CONREP)**

The criteria used for an SVP matriculating to Module IV: *Community Reintegration* include, but are not limited to, the following:

(1) Successfully completing the primary content areas of Module III: *Treatment Integration and Community Preparation*, individualized dynamic risk groups, and *Discharge Planning*.

(2) Successfully completing and submitting the following assignments (with review and approval by the Treatment Team):

- *Integrated Old Me/New Me, VIA Strengths and Virtues into the Better Life Plan*
- *Tendency Management plan for individualized meaningful dynamic risk factor*
- *Protective Factors*
- *CONREP Terms and Conditions*
- *Community Reintegration*

(3) Completing updated assessments within 6 months of referral for treatment review to identify treatment progress. Results of assessments suggest maintenance and/or ongoing commitment to addressing dynamic risk factors and patient's treatment program.

(4) Updating and completing violence risk assessments, if patient has demonstrated a history of violence while in the SOTP - with results yielding no or minimal concerns, and risk remains low.

(5) Completing a community safety plan specific to the patient created in collaboration with the hospital treatment team and outpatient provider.

c. **Procedure for Advancing to Module IV: Community Reintegration through the Liberty Conditional Release Program**

A referral for a *Treatment Progress Review* for Module IV: *Community Reintegration* will occur when the individual, the treatment team, and the SOTP facilitators confirm that the following items have been accomplished:

(1) Clinical findings, measures of progress, risk assessments, and risk factors specific to the patient and community safety plan have been documented to support a recommendation that the patient may be safely treated as an outpatient in the community.

(2) The patient has met the criteria for advancing to Module IV: *Community Reintegration* module.

(3) The treatment team will prepare a draft of the Community Safety Plan that meets all of the requirements of the Department's Community Safety Plan Format (dated Apr. 19, 2002) and is based on their knowledge of the individual. The team will collaborate with the treating clinicians and the Community Release Program when preparing these documents. The psychologist will make these materials available to the panel.

(4) The patient will provide a copy of his or her assignments and any additional therapeutic documents to the treating clinician who will provide copies of these documents and any updated assessments to the DSH-C SOTP Director. The copies of these documents and updated assessment results will be provided to the panel and Liberty Healthcare.

(5) The medical director, or designee will serve as panel chair and an additional two clinicians will be selected as panel members. The chief psychologist, the senior supervising psychologist, the core group clinicians, the assigned unit clinician, the clinical administrator, and Liberty Healthcare (community program director for the county of commitment) will be contacted and their attendance requested. The progress review will be scheduled when all parties can be present. At a minimum, the core clinician, assigned team psychologist, Liberty representative, and the medical director should be in attendance, but the review should never be delayed more than 30 days.

(6) The primary SOTP clinician will begin the review with a brief overview of the patient's course of treatment, cooperation in the treatment program, specific assessment results, and examples of progress, and will address any questions or concerns. The patient will be available to be interviewed by the panel, to present his or her treatment progress, and to answer questions.

(7) The panel will confer and render a decision and recommendation.

(8) If the individual has met all of the criteria, the panel will recommend the

patient for *Community Reintegration.*

(9) If the individual has not met all of the criteria, the medical director and the panel will provide the patient and the team with specific guidance as to deficient areas.

(10) A representative from the panel will document the patient's progress in the patient's chart under the "Psychology" tab. Notes should capture decision, current strengths, and future issues for the patient. Patient's assignments and work will be returned to the treating clinician to be returned to the patient.

## 4. Module IV: Conditional Release through the Liberty Conditional Release Program (CONREP)

CONREP is responsible for supervising and treating conditionally released SVP patients court-ordered into the community. The program's primary objective is to balance community safety with opportunities for SVP patients to successfully and safely integrate into their communities. This is accomplished by the implementing the *Containment Model,* which uses collaborative case management as well as intensive, specialized sex offender treatment, supervision, and assessment services.

For every SVP patient, a *Community Safety Team* (CST) is formed consisting of specially trained supervisors, polygraph examiners, treatment providers, psychiatrists, assessment specialists, law enforcement representatives, and victim advocates. The CST meets at least monthly to exchange information and coordinate its efforts for the protection of the community, and the reintegration of the patient.

Conditionally released SVP patients must comply with court-ordered terms and conditions. These terms and conditions include, but are not limited to, attendance at individual and group therapy sessions, psychiatric appointments, substance abuse treatment, active GPS monitoring, daily telephone contact, medication compliance, regular home visits and searches, collateral contacts, random substance abuse testing, polygraph examinations, and assessments of sexual interest and risk. Strong relationships are developed between staff and local law enforcement for enhanced supervision. Failure to comply with these terms and conditions could result in the patient being returned to the state hospital.

Patients are expected to develop the basic skills needed to reintegrate into the community following years of incarceration and hospitalization. With staff support, patients are encouraged to access various community resources for education, training, and job placement. The goal is for patients to eventually become financially and emotionally independent.

Disclaimer: The DSH-C SOTP will be revised as program evaluations and research developments present promising directions in the assessment and treatment of sexual offenders.

## References

Abel Screening, Inc. (2004). Revolutionize your sex offender assessment. Abel Assessment for sexual interest. Retrieved from http:www.abelscreen.com/ Product_Information.html

Abel, G. G., Huffman, J., Warberg, B., & Holland, C. L. (1998). Visual reaction time and plethysmography as measures of sexual interest in child molesters. Sexual Abuse: A Journal of Research and Treatment, 10, 81–95.

American Psychological Association. (2002). Ethical principle of psychologists and code of conduct. Retrieved from http://www.apa.org/ethics/code/code.pdf

American Psychological Association. (2013). Specialty Guidelines for Forensic Psychology. Retrieved from https://www.apa.org/practice/guidelines/forensic-psychology.pdf

Andrews, D. A & Bonta, J. (2010). The Psychology of Criminal Conduct (5th Edition). New Providence, NJ: LexisNexis.

Association for the Treatment of Sexual Abusers. (1993). The ATSA practitioner's handbook. Beaverton, OR: Author

Association for the Treatment of Sexual Abusers. (2005). Practice Standards and Guidelines. Beaverton, OR.

Blasingame, G. D. (1998). Suggested clinical uses of polygraphy in community-based sexual offender treatment programs. Sexual Abuse: Journal of Research and Treatment, 10(1), 37-45.

Bonta, J., & Andrews, D. A. (2007). Risk-Need-Responsivity model for offender assessment and rehabilitation. (Report no. 2007–06). Ottawa, Canada: Department of Public Safety and Emergency Preparedness Canada. Retrieved from www.publicsafety.gc.ca/res/cor/rep/risk need 200706-eng.aspx

Gannon, T. A., King, T., Miles, H., Lockerbie, L., & Willis, G. M. (2011). Good Lives sexual offender treatment for mentally disordered offenders. The British Journal of Forensic Practice, 13(3), 153-168.

Hanson, R. K., Bourgon, G., Helmus, L., & Hodgson, S. (2009). The principles of effective correctional treatment also apply to sexual offenders: A meta-analysis. Criminal Justice and Behavior, 36(9), 865-891.

Hanson, R. K., Harris, A. J. R., Scott, T-L, & Helmus, L. (2007). Assessing the Risk of Sexual Offenders on Community Supervision: The Dynamic Supervision Project. User Report 0207-05. Ottawa: Department of the Solicitor General of Canada. Available at www.pssp.gc.ca/res/cor/rep

Harris, A. J. R., & Hanson, R. K. (2010). Clinical, actuarial, and dynamic risk assessment of sexual offenders: Why do they keep changing things? Journal of Sexual Aggression, 16(3), 296-310.

Harris, G. T., & Rice, M. E. (1996). The science in phallometric testing of men's sexual preferences. Current Directions in Psychological Science, 5, 156-160.

Jennings, J.L., & Sawyer, S. (2003). Principles and Techniques for maximizing the Effectiveness of Group Therapy with Sex Offenders. *Sexual Abuse: A Journal of Research and Treatment,* 15(4), 251-267.

Laws, D. R. (2009). Penile plethysmography: Strengths, limitations, innovations. In D. Thornton, D. R. Laws, D. Thornton, D. R. Laws (Eds.), *Cognitive approaches to the assessment of sexual interest in sexual offenders* (pp. 7-29). Wiley-Blackwell.

Lösel, F., & Schmucker, M. (2005). The effectiveness of treatment for sexual offenders: A comprehensive meta-analysis. *Journal of Experimental Criminology, 1*(1), 117-146.

Mann, R. E., & Barnett, G. D. (2013). Victim empathy intervention with sexual offenders: Rehabilitation, punishment, or correctional quackery? *Sexual Abuse: Journal of Research and Treatment, 25*(3), 282-301.

Mann, R. E., Hanson, R. K., & Thornton, D. (2010). Assessing risk for sexual recidivism: Some proposals on the nature of psychologically meaningful risk factors. *Sexual Abuse: A Journal of Research and Treatment, 22*(2), 191-217.

Marques, J. K., Day, D. M., Nelson, C., & West, M. A. (1993). Findings and recommendations from California's experimental treatment program. In G. N. Hall, R. Hirschman, J. R. Graham, M. S. Zaragoza, G. N. Hall, R. Hirschman, ... M. S. Zaragoza (Eds.), *Sexual aggression: Issues in etiology, assessment, and treatment* (pp. 197-214). Philadelphia, PA, US: Taylor & Francis.

Marques, J. K., Wiederanders, M., Day, D. M., Nelson, C., & van Ommeren, A. (2005). Effects of a Relapse Prevention Program on Sexual Recidivism: Final Results From California's Sex Offender Treatment and Evaluation Project (SOTEP). *Sexual Abuse: Journal of Research And Treatment, 17*(1), 79-107.

Marshall, W. L. (2006). Ammonia Aversion With an Exhibitionist: A Case Study. *Clinical Case Studies, 5* (1),15-24.

Marshall, W. L. (2006). Olfactory Aversion and Directed Masturbation in the Modification of Deviant Preferences: A Case Study of a Child Molester. *Clinical Case Studies, 5*(1), 3-14.

Marshall, W. L. (2007). Covert association: A case demonstration with a child molester. *Clinical Case Studies, 6*(3), 218-231.

Marshall, W. L. (2009). Manualization: A blessing or a curse? *Journal of Sexual Aggression, 15*(2), 109-120.

Marshall, L. E., Marshall, W. L. (2009). *The Therapist Rating Scale-2.* Unpublished Manual, Retrieved from http://rockwoodpsyc.com/outside/wp-content/uploads/2011/03/TRS-2-Full-Package_May-2010.pdf

Marshall, W. L., Marshall, L. E., Serran, G. A., Fernandez, Y. M. (2006). *Treating Sexual Offenders: An Integrated Approach.* New York, New York: Routledge

Marshall, W. L., Marshall, L. E., Serran, G. A., & O'Brien, M. D. (2009). Self-esteem, shame, cognitive distortions and empathy in sexual offenders: Their integration and treatment

implications. *Psychology, Crime & Law, 15*(2-3), 217-234.

Marshall, W. L., & O'Brien, M. D. (2014). Balancing clients' strengths and deficits in sexual offender treatment: The Rockwood treatment approach. In R. C. Tafrate, D. Mitchell, R. C. Tafrate, D. Mitchell (Eds.), *Forensic CBT: A handbook for clinical practice* (pp. 281-301). Wiley-Blackwell.

McGrath, R. J., Cumming, G. F., & Lasher, M. P. (2013). *Sex Offender Treatment Intervention and Progress Scale Manual.* Retrieved from http://www.csom.org/pubs/SOTIPSMANUALOctober2013.pdf

McGrath, R.J., Lasher, M.P., & Cumming, G.F. (2012). The Sex Offender Treatment Intervention and Progress Scale (SOTIPS): Psychometric Properties and Incremental Predictive Validity With Static-99R. *Sexual Abuse: A Journal of Research and Treatment, 24*(5), 431-458.

Nunes, K. L., & Babchishin, K. M. (2012). Construct validity of Stable-2000 and Stable-2007 scores. *Sexual Abuse: Journal of Research and Treatment, 24*(1), 29-45.

Nunes, K. L., Hanson, R. K., Firestone, P., Moulden, H. M., Greenberg, D. M., & Bradford, J. M. (2007). Denial predicts recidivism for some sexual offenders. *Sexual Abuse: Journal of Research and Treatment, 19*(2), 91-105.

O'Donohue, W., & Letourneau, E. (1992). The psychometric properties of the penile tumescence assessment of child molesters. *Journal of Psychopathology and Behavioral Assessment, 3,* 259-274

Olver, M. E., & Wong, S. P. (2013). Treatment programs for high risk sexual offenders: Program and offender characteristics, attrition, treatment change and recidivism. *Aggression and Violent Behavior, 18*(5), 579-591.

Serran, G. A., Marshall, W. L., Marshall, L. E., & O'Brien, M. D. (2013). Group or individual therapy in the treatment of sexual offenders. In L. A. Craig, L. Dixon, T. A. Gannon, L. A. Craig, L. Dixon, T. A. Gannon (Eds.), *What works in offender rehabilitation: An evidence-based approach to assessment and treatment* (pp. 452-467). Wiley-Blackwell.

Ward, T., Hudson, S.M., & Keenan, T. (1998). A Self-Regulation model of the Sexual Offense Process. *Sexual Abuse: A Journal of Research and Treatment, 10*(2), 141-157.

Yates, P. M. (2009). Is sexual offender denial related to sex offence risk and recidivism? A review and treatment implications. Psychology, Crime & Law, 15(2-3), 183-199.

Yates, P. M. (2013). Treatment of sexual offenders: Research, best practices, and emerging models. *International Journal of Behavioral Consultation And Therapy, 8*(3-4), 89-95.

Yates, P.M., Prescott, D., & Ward, T. (2010) *Applying the Good Lives and Self-Regulation Models to Sex Offender Treatment: A Practical Guide for Clinicians.* Brandon, VT: The Safer Society Press.

Yates, P.M., & Kingston, D.A. (2006). The Self-Regulation Model of Sexual Offending: The Relationship Between Offense Pathways and Static and Dynamic Sexual Offense Risk. *Sexual Abuse: A Journal of Research and Treatment, 18*(3), 259-270.

Billy Redding
Coalinga State Hospital
P.O. Box 5003
Coalinga, CA 93210-5003
Tel: (559) 935-8771

Plaintiff in Pro Se

September 23, 2022

Clerk of the Court
United States District Court
Eastern District of California
2500 Tulare Street, Room 1501
Fresno, CA 93721-2201

Re: Filing of Civil Complaint; Providing File-Stamped Copy of
Cover Sheet

Dear Sir,

Please be so kind as to file the attached material with the
Court.

Please additionally be so kind as to provide me with a file-
stamped cover of the cover page of the complaint in the enclosed
self-addressed stamped envelope.

Thank you.

Sincerely,

Billy Redding
Plaintiff in Pro Se